ERIC DIXON,

      Plaintiff,

      v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

Civ. No. 18-13664 (KM)

**OPINION**

## KEVIN MCNULTY, U.S.D.J.:

Plaintiff Eric Dixon brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to review a final decision of the Commissioner of Social Security ("Commissioner") denying his claims to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Dixon seeks to reverse the finding of the Administrative Law Judge ("ALJ") that he has not met the Social Security Act's definition of disabled for the period beginning July 13, 2013, the alleged injury-onset date, through the date he was last insured, September 30, 2016.

The issue presented is whether the decision of the ALJ to deny Dixon's application for DIB is supported by substantial evidence. For the reasons stated below, this matter is remanded to the Commissioner for further findings.

### A. Facts

Mr. Dixon is now 55 years old and has a high school diploma. (R. 42) He has a history of severe low back problems. (R. 40) When Mr. Dixon was 49 years old, he reinjured his back as a result of a motor vehicle accident. It is this injury that caused him to file for DIB. (R. 41)

Prior to his injury in 2013, Mr. Dixon held various jobs, including working as a deliveryman, working on an assembly line, and working as a day

laborer for a variety of companies, where he would assist with deliveries, loading and unloading pallets, and loading and unloading trucks. (R. 42–45)

### 1. Prior Low Back Surgeries

In August 2005 Mr. Dixon had a lumbar discectomy to correct a ruptured disc in his lower back. (R. 285, 288) Nearly a month after surgery, Mr. Dixon reported that he was free of pain but had some residual numbness. (R. 283) Mr. Dixon was then free of back pain for a number of years. (R. 302)

However, in 2009, his back pain returned. On April 24, 2009, Mr. Dixon again had to have surgery to correct herniated discs. (R. 297) This time, Mr. Dixon underwent a lumbar interbody fusion whereby a metal rod was fused to his spine. (R. 297–99) Mr. Dixon was discharged from the hospital after five days and referred to rehab as well as to pain management care. (R. 302)

### 2. July 2013 Injury

On July 13, 2013, Mr. Dixon was walking in a crosswalk when he was hit by a vehicle and thrown to the ground. (R. 47, 352) He was taken to Trinitas Regional Medical Center for treatment, and was discharged the same day. (R. 303–4) He was treated for pain to his left side as well as head, back, and neck. (R. 307–8) On a scale of 1 to 10, he stated that his pain was a 4. (R. 309) After being provided with pain mediation, he stated that he felt better. (R. 310) Several CT scans and exams were performed. (R. 311–31) There was no definitive evidence that Mr. Dixon had fractured anything (R. 321); however, it appears that Mr. Dixon received treatment to his arm in the form of an ace bandage and splint. (R. 322–31)

Mr. Dixon asserts that as a result of the accident, he has had daily pain throughout his lower back. (R. 50). The pain radiates through his left leg. (*Id.*) The pain, says Mr. Dixon, is there all the time and he rated his pain at a five or six out of ten. (*Id.*) If he stands for 10 minutes, the pain in his back and leg increases. (R. 50–51) Mr. Dixon also asserts that his leg gives out at times. To assist with walking, Mr. Dixon has transitioned from a prescribed cane to a heavier walking stick. (R. 51–52) However, Mr. Dixon testified that he is only

able to walk a block at a time, and even then only at a slow pace, before the pain in his back forces him to rest. (R. 57)

Mr. Dixon stated that he has also experienced intermittent pain in his neck as a result of the accident. (R. 53) His neck pain is less predictable; anything could cause his neck to hurt, such as changes in the weather or sudden movements. (R. 53–54) To treat his pain, Mr. Dixon states that he has gone to physical therapy, takes pain medication, and wears a back brace. (R. 54–56, 60–61) An effect of the pain medication, Mr. Dixon testified, is that he finds it difficult to concentrate or stay awake. (R. 63) He finds sitting more than 15-20 minutes to be difficult and has difficulty getting comfortable sleeping (R. 59–60, 62) Mr. Dixon is most comfortable lying down with his feet up. (R. 59)

Between his discharge from the hospital on July 13, 2013 and January 2014, it appears that Mr. Dixon received pain management treatment for his back. (R. 352, 358) However, the record does not contain any medical reports for the treatments in that period. The administrative record contains medical records that resume on January 8, 2014.

On January 8, 2014, Mr. Dixon was seen for chiropractic treatment by Dr. Richard Ryan at Northeast Spine & Wellness Center. Mr. Dixon presented with severe back pain that radiated down his right leg to his foot and elbow and hip pain. (R. 358) Dr. Ryan found that Mr. Dixon's deep tendon reflexes of his lower left extremities were sluggish and muscle strength testing of the lower extremities showed weakens due to pain. (*Id.*) Dr. Ryan wrote a detailed report and found that Mr. Dixon suffered from decreased joint mobility, decreased range of motion of his spine, spasms and muscle weakness, vertebral tenderness, muscle soreness, and soft tissue swelling. (R. 359) Mr. Dixon's symptoms required "acute relief care to decrease daily recurring pain associated with activities of daily living." (R. 359) Dr. Ryan referred Mr. Dixon to a spine surgeon (Dr. Ani Nasser) and ordered physical therapy. (*Id.*)

On January 24, 2014, Mr. Dixon was seen by Dr. Nasser at the Orthopaedic Spine Institute. Mr. Dixon reported to Dr. Nasser that his "pain is present constantly. Qualitatively, the pain is rated as severe. Functional

impairment is very severe – when present the patient is unable to carry out any daily activities. The pain interferes with sleep regularly. Since onset, the overall severity of the pain has greatly increased." (R. 352) He reported weakness in his lower extremities and decreased exercise tolerance. Upon evaluation by Dr. Nasser, Mr. Dixon's musculoskeletal evaluation was normal, although his ability to bend or extend his back was restricted. (R. 354) The neurological and psychiatric evaluations noted that Mr. Dixon had normal orientation and had intact muscle strength. (R. 354) Nevertheless, Dr. Nassar noted that his condition with respect to his back was "unstable" and his preexisting back symptoms were aggravated by the July 13, 2013 motor vehicle accident. (R. 354–55) Dr. Nasser ordered follow-up testing to be done on Mr. Dixon. (R. 355) Mr. Dixon's insurance denied coverage for these tests. (R. 358–79)

Between February and April 2014, Mr. Dixon continued to be seen by Dr. Ryan and Dr. Nasser. In general, Dr. Ryan's assessments of Mr. Dixon's physical condition are markedly different from the formulaic assessments reported by Dr. Nasser.

Dr. Nasser next saw Mr. Dixon on February 7, 2014. Mr. Dixon reported that the severity of his pain had decreased to a moderate level and that his pain now interfered with some daily activities rather than all. (R. 348). However, he still reported that his weakness and exercise intolerance remained unchanged. Again, Dr. Nasser reported that Mr. Dixon's musculoskeletal, neurological, and psychiatric evaluations were normal. (R. 349–50)

Three days later, on February 10, 2014, Dr. Ryan re-evaluated Mr. Dixon and continued to find that Mr. Dixon suffered from pain, spasms, tender muscles in his back, swelling with tenderness in his spine, weakness, and decreased joint mobility. (R. 361–62) It was still Dr. Ryan's opinion that Mr. Dixon "required acute relief care to decrease daily recurring pain." (R. 362)

Dr. Nasser saw Mr. Dixon three more times, on February 28, 2014, March 14, 2014, and April 16, 2014. The reports from these three visits are substantively identical. During the February 28th visit to Dr. Nasser, Mr. Dixon stated that his pain was getting worse and that the weather and any activity

bothered his back. (R. 344) Dr. Nasser continued to report normal findings, but noted that "it is medically necessary for patient to have testing which is directly related to the accident." (R. 347) The March and April reports continue to highlight that Mr. Dixon's pain, weakness, and inability to exercise remained unchanged, while his musculoskeletal, neurological, and psychiatric evaluations were normal.

In the first half of 2014, Mr. Dixon continued to receive physical therapy—electrical/muscle stimulation, strengthening exercises, and stretching exercises (R. 369–78), but his physical condition did not improve in response to the therapy. (Id.; see also R. 338). By contrast to Dr. Nasser's reports during this time, Dr. Ryan continued to note that Mr. Dixon suffered from, for example, pain, muscle spasms, and tenderness. (R. 364–66) Dr. Ryan added in his March 2014 report that Mr. Dixon's "gait is hampered due to pain and weakness. The patient has a lot of problem getting out of bed and getting up from a seated position." (Id.)

Dr. Ryan's findings are consistent with those of Nurse Practitioner Lauren De Lucia in June 2014. On June 24, 2014, nearly a year after the accident, NP De Lucia noted that Mr. Dixon was unable to hold his body and head erect and that he was unbalanced. (R. 387) Mr. Dixon had an upright posture and good spinal alignment but had poor muscle/strength/tone. (R. 388) He had decreased flexion, rotation, and extension of his lumbar spine, unsteady gait, but was able to walk on his heels and toes. (Id.) Neurologically, NP De Lucia found, he had good immediate recall, his thought process was intact, his perceptions were appropriate, and his speech was clear and fluid. (Id.)

On July 22, 2014, Mr. Dixon returned to see NP De Lucia, who reported that his back problems had improved, but he was still suffering from moderate to severe pain. (R. 391) His balance had improved, he had upright posture, but still had poor muscle strength, decreased mobility, and decreased lumbar movement. (R. 393)

In August 2014, Mr. Dixon reported no change in his condition, NP De Lucia's August report is similar to her July 2014 report. (R. 396–402) In September 2014, Mr. Dixon reported that his pain had again worsened. (R. 402) In October 2014, Mr. Dixon reported no further changes to his condition. (R. 407).

In September 2014, Mr. Dixon had a CT scan that revealed a decompressed spinal canal, post-surgical changes at L4-S1, and spondylotic changes at L3-L4. (R. 451)

On October 6, 2014, nearly sixteen months after the July 2013 car accident, Mr. Dixon was seen by the state's consultative examiner, Dr. Betty Vekhnis, at the Physical Rehabilitation Center, LLP. Dr. Vekhnis noted that Mr. Dixon's September 30, 2014 lumbar spine CT showed surgical changes and a decompressed spinal canal. (R. 379) Dr. Vekhnis noted that Mr. Dixon could walk in the office without a cane, had a normal heel to toe gait, was able to walk on his heels and toes, and did not squat. (R. 379). Dr. Vekhnis examined Mr. Dixon's spine, noting that there was no vertebral tenderness and he had full range of motion. (R. 379). Her impression was that Mr. Dixon could walk short distances without a cane and has normal function of his hands for fine and gross motor manipulations. (R. 380). Dr. Vekhnis included a "passive range of motion chart" in her assessment. (R. 381–83) Most of the chart is not filled in; however, the lumbar spine portion indicates that Mr. Dixon has normal muscle strength (5/5) but that he received a 60/90 on the straight leg test when in the supine position. Dr. Vekhnis did not fill in the results when Mr. Dixon was sitting. (R. 382)

In November 2014, NP De Lucia was able to get Mr. Dixon a TENS unit, and Mr. Dixon reported that his functionality was increasing with the use of that unit. As a result he was able to walk more, bend more, and perform activities of daily living. (R. 416–17). He was seen again by NP De Lucia in December 2014 and was fitted for a back brace. (R. 422) NP De Lucia noted continued progress through use of the TENS unit. (R. 423) NP De Lucia continued to see Mr. Dixon monthly through February 2015 (records were

provided through February 2015 per the State's January 30, 2015 document request). (R. 424–34) NP De Lucia's January and February reports are similar to her November report in that she notes that Mr. Dixon's functionality was increasing with use of the TENS unit and back brace. (*Id.*)

In April 2016, nearly three years after the car accident, Mr. Dixon was seen by Dr. Edwin Constantino, and he continued to see Dr. Constantino through March 2017. Dr. Constantino noted in April 2016 that Mr. Dixon's lumbar spine had decreased rotation, flexion, and extension and that he had decreased range of motion. (R. 448) Dr. Constantino continued to note from each visit from April 2016 to March 2017 that Mr. Dixon had a decreased range of motion and had decreased rotation, flexion, and extension in his lumbar spine. (R. 435, 438–41, 445–46). However, in May 2016, Dr. Constantino noted that Mr. Dixon's pain medication and TENS unit helped alleviate his pain, (R. 447). Throughout 2016, Mr. Dixon continued to report occasions where his pain radiated to his lower extremities (R. 441, 445) but at times his pain also decreased and was sufficiently managed by pain medication. (R 435, 440, 444, 446)

### 3. Disability Determination

On October 16, 2014, the State's physician, Dr. Deogracias Bustos, completed a disability determination explanation. (R. 106–115) Dr. Bustos reviewed records from the New England Spine & Wellness Center, Trinitas Hospital, and Dr. Nasser. (R. 110) Dr. Bustos summarized his findings from the records from N.E. Spine & Wellness Center from January 2014 to April 24, 2014 as follows: "severe low back pain radiating to rt leg to the foot, pain level 10/10" and "decreased sensation rt L5 and 21, muscle strength – weakness due to pain b/l lumbar flexor . . . some muscle spasm, tenderness" (R. 110) During a similar time period, Dr. Bustos summarized the records from Dr. Nasser as follows "LS – no tenderness / no muscle spasm, ROM – flexion/extension – restricted due to low back pain UE/LE – normal rom, muscle strength and ton and stability" (R. 110) Finally, Dr. Bustos summarized an October 6, 2014 visit were Mr. Dixon was "able to walk w/o cane, normal

heel toe gait, came to the office using straight cane, lumbar brace, able to walk on heels and toes, unable to squat, normal function of the hand." (R. 111) Ultimately Dr. Bustos determined that Mr. Dixon suffered from two severe impairments: a spine disorder and obesity. (R. 111) He determined that Mr. Dixon's RFC was such that he could occasionally lift items weighing 20 pounds, frequently lift items weighing 10 pounds, could stand for 4 hours and sit about 6 hours in an 8-hour workday. (R. 112) Dr. Bustos also found that Mr. Dixon could climb stairs, balance, stoop, crouch and crawl occasionally, but could never climb ladders. Based on his review, Dr. Bustos found that Mr. Dixon was not limited to unskilled work and could sustain a sedentary job. (R. 114)

Mr. Dixon sought reconsideration of these findings alleging that his symptoms were getting worse. (R. 122) Mr. Dixon submitted additional medical records from a February 4, 2015 examination by Del Lucia Advance. That examination rendered the following results: "Cervical: normal flexion and extension, cervical axial compress, negative, faber decreased, lumbar flexion decreased, lumbar rotation and extension decreased. SGR: negative, Smooth steady gait with good coordination . . . mobility decreased. Extremities LUE 5/5, LLE: 4/5 RUE: 5/5, RLE: 4/5 . . . . neurologically normal." (R. 122) Based on this evaluation, Dr. Bustos's findings were confirmed. (R. 125)

### B. Procedural History

On May 27, 2014, Mr. Dixon applied for DIB. (R. 17) The application was denied initially (R. 128) and on rehearing. (R. 136) On April 7, 2017 the ALJ held a hearing. (R. 36)

On July 14, 2017, the ALJ issued a decision (R. 17–29) denying disability benefits on the ground that Mr. Dixon was still able to perform work at step five of the sequential evaluation. (*Id.*)

Mr. Dixon appealed. On July 12, 2018, the Appeals Council concluded that there were no grounds for review and affirmed the decision of the ALJ. (R. 1)

8

On September 7, 2018, Mr. Dixon filed this action seeking to overturn the ALJ's decision to deny benefits. Initially assigned to Chief Judge Linares, the case was reassigned to me upon Judge Linares's retirement. (DE 12)

## I. DISCUSSION

### A. Standard of Review

As to all legal issues, this Court conducts a plenary review. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). As to factual findings, this Court adheres to the ALJ's findings, as long as they are supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing 42 U.S.C. § 405(g)). Where facts are disputed, this Court will "determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (internal quotation marks and citation omitted). Substantial evidence "is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted).

When there is substantial evidence to support the ALJ's factual findings, this Court must abide by them. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)); *Zirnsak*, 777 F.3d at 610-11 ("[W]e are mindful that we must not substitute our own judgment for that of the fact finder."). This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Commissioner's decision, or it may remand the matter to the Commissioner for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984); *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 865–66 (3d Cir. 2007). A person is deemed unable to engage in substantial gainful activity

> only if his physical or mental impairment or impairments are of
> such severity that he is not only unable to do his previous work
> but cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in

the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 1382c(a)(3)(B).

In reaching a decision, an ALJ is only required to addressed relevant examinations, opinion evidence, and the claimant's complaints. *See Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981) (An ALJ is only required to "indicate that s/he has considered all the evidence, both for and against the claim, and provide some explanation of why s/he has rejected probative evidence. . . . [T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice.").

Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five-step inquiry. *See Podedworny*, 745 F.2d at 221–22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119–20 (3d Cir. 2000).

## B.  The Social Security Act and the Five-Step Process

Under the authority of the Social Security Act, the Administration has established a five-step evaluation process for determining whether a claimant is disabled and entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. This Court's review necessarily incorporates a determination of whether the ALJ properly followed the five-step process prescribed by regulation. The steps may be briefly summarized as follows:

**Step One:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§

404.1520(b), 416.920(b). If yes, the claimant is not disabled. If not, move to step two.

**Step Two:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. If the claimant has a severe impairment, move to step three.

**Step Three:** Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Pt. 404, subpt. P, app. 1, Pt. A. (Those Part A criteria are purposely set at a high level to identify clear cases of disability without further analysis). If so, the claimant is automatically eligible to receive benefits; if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**Step Four:** Determine whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to perform past relevant work. *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If yes, the claimant is not disabled. If not, move to step five.

**Step Five:** At this point, the burden shifts to the Commissioner to demonstrate that the claimant, considering his age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

Dixon's appeal hinges on the ALJ's findings at step three and as to his RFC findings, which he says are not supported by substantial evidence. (Pl. Br. at 14–15). As to Mr. Dixon's RFC, a claimant's RFC is not a medical diagnosis as such. *See Titles II & XVI: Med. Source Opinions on Issues Reserved to the Comm'r*, SSR 96-5P, 1996 WL 374183 at *2 (S.S.A. July 2, 1996). Instead, it is an administrative finding reserved for the Commissioner. *Id.*; *see also Pintal v. Comm'r of Soc. Sec.*, 602 F. App'x 84, 87 (3d Cir. 2015) ("The ultimate legal determination of disability is reserved for the Commissioner."); *see also*

11

*Robinson v. Colvin*, 137 F. Supp. 3d 630, 644 (D. Del. 2015) ("[O]pinions that a claimant is 'disabled' or 'unable to work' are not medical opinions and are not given special significance because opinions as to whether or not a claimant is disabled are reserved for the Commissioner."); 20 C.F.R. § 404.1527(d) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").

An ALJ is not bound by the capacity determinations of a treating physician. *See Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011). Indeed, the determination of disability is legal in nature, and is reserved for the ALJ within the constraints of the statute and regulations. *See Mays v. Barnhart*, 78 F. App'x 808, 813 (3d Cir. 2003) ("[T]he ALJ . . . is not required to seek a separate expert medical opinion."); *Glass v. Colvin*, No. 14-237, 2015 WL 5732175 at *1 (W.D. Pa. Sept. 30, 2015) ("[T]he ALJ is not limited to choosing between competing opinions in the record . . . .").

Medical opinions need be credited by the ALJ only if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). An ALJ may, if appropriate, elect to disregard a medical opinion entirely: "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996); *see also Irey v. Colvin*, No. 13-7423, 2016 WL 337019 at *4 (E.D. Pa. Jan. 27, 2016) ("[T]he ALJ is not bound by the opinion of any one physician[] and can reject an opinion if there is a lack of support or a finding of contradictory evidence in the record.").

### C. The ALJ's Decision

On July 14, 2017, the ALJ issued a decision finding that Mr. Dixon was not disabled within the meaning of the Social Security Act. (R. 29) The ALJ determined that Dixon's impairments were severe, but he also determined that, given Dixon's age, education, work experience, and RFC, he was capable of

making a successful adjustment to other jobs that existed in significant numbers in the national economy. (R. 28)

The ALJ followed the five-step process outlined above to determine that Ramos was not disabled. The ALJ's findings are summarized as follows:

**Step One:** At step one, the ALJ determined that Dixon had not engaged in substantial gainful activity for a continuous 12-month period from July 13, 2013 to September 30, 2016. (R. 19)

**Step Two:** At step two, the ALJ determined that Dixon had the following severe impairments: lumbar degenerative disc disease and obesity. (R. 19)

**Step Three:** At step three, the ALJ determined that Dixon did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, subpt. P., app. 1. (R. 19–20) The ALJ made particular reference to Listing 1.04,[1] finding that claimant's impairments did not meet or medically equal the criteria listed. (R. 20)

**Step Four:** At step four, the ALJ determined that based on Mr. Dixon's RFC, he could not perform his past relevant work (R. 28), but that he had the

---

[1]   **1.04** *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

OR

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

OR

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

RFC to perform light work as defined in 20 C.F.R. 4404.1567(b) and 416.967(b) with additional limitations. (R. 20–27).

The ALJ found that Dixon's RFC limited him to performing light work with the following limitations:

> [T]he claimant can stand and walk for a combined total of 4 hours in an 8 hour work day; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance; occasionally stoop, kneel, crouch, crawl. The claimant must be permitted to stand and stretch at the workstation for 1-5 minutes after 30 minutes si[t]ting, and to sit for 1-5 minutes at the workstation after 30 minutes of standing or walking, while continuing work tasks. Further, due to pain and other symptoms, the claimant would be absent form work 1 day per month on average, and would be off task 5% of the work day.

(R. 21) The ALJ determined that notwithstanding Mr. Dixon's testimony regarding his physical pain and limitations, his statements concerning the "intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (R. 23)

**Step Five:** At step five, the ALJ considered Mr. Dixon's age, education, work experience and RFC in conjunction with the Medical-Vocational Guidelines. (R. 28–29) Relying on the testimony of the vocational expert, the ALJ identified several representative jobs that Dixon could perform: (1) assembler/arranger; (2) information clerk; and (3) fund raiser.

Accordingly, the ALJ determined that Mr. Dixon was not disabled at any point, as defined by the Social Security Act, from July 13, 2013 to September 30, 2016. (R. 19)

### D. Analysis of Mr. Dixon's Appeal

#### 1. The ALJ's Step Three Evaluation

At step three, the ALJ found that Mr. Dixon does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Pt. 404, subpt. P., app. 1. (R. 19–20) Mr. Dixon argues that the ALJ erred at step three by failing to address his obesity and failing to address medical equivalents. (Pl. Br. 14–29).

### i.  Discussion of Obesity

Obesity was removed as a "listed impairment" in 1999, but, as the Third Circuit has recognized, "this did not eliminate obesity as a cause of disability. To the contrary, the Commissioner promulgated [Social Security Ruling] 00–3p, indicating how obesity is to be considered. This SSR replaced an automatic designation of obesity as a Listed Impairment, based on a claimant's height and weight, with an individualized inquiry, focused on the combined effect of obesity and other severe impairments afflicting the claimant." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 503 (3d Cir. 2009) (citing SSR 00–3p, 65 Fed.Reg. 31039, 31040–42 (May 15, 2000)); *see also Webster v. Astrue*, 628 F.Supp.2d 1028, 1031 (S.D.Iowa 2009) (explaining "This SSR points out that obesity is a life long impairment, and that although the obesity listing was deleted, the impairment requires special consideration in the evaluation of a disability claim," and, on remand, directing "both the ALJ and counsel . . . to read this ruling carefully, and then apply it to the facts of Plaintiff's case").

In 2002, SSR 00–3p was superseded by SSR 02–1p, 67 Fed.Reg. 57859–02 (Sept. 12, 2002), but SSR 02–1p did not materially amend SSR 00–3p. *See Diaz*, 577 F.3d at 503.

SSR 02–1p provides the following guidance:

[W]e consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

. . . .

Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing.... For example, when evaluating impairments under mental disorder listings 12.05C, 112.05D, or

15

112.05F, obesity that is "severe," ... satisfies the criteria in listing 12.05C for a physical impairment imposing an additional and significant work-related limitation of function and in listings 112.05D and 112.05F for a physical impairment imposing an additional and significant limitation of function.... We may also find that obesity, by itself, is medically equivalent to a listed impairment.... We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment.

Social Security Ruling, SSR 02–1p; Titles II and XVI: Evaluation of Obesity, 67 FR 57859–02.

Obesity is thus mentioned as a potential exacerbating factor in several listings. For instance, Listing 1.00, concerning musculoskeletal disorders, states that:

Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, subpt. P., app. 1, ¶ 1.00Q.

At step two, the ALJ found that Mr. Dixon's obesity was a severe impairment. (R. 19) However, at step 3 the ALJ failed to consider the cumulative and additional effects of Mr. Dixon's obesity when determining if he qualified for one of the listed impairments. The ALJ provides a conclusory discussion of Mr. Dixon's obesity at step three. The opinion states:

I have also given consideration to Social Security Ruling 02–1p, which instructs adjudicators to consider the effects of obesity not only under the listings, but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity. When

> obesity is identified as a medically determinable impairment,
> consideration will be given to any functional limitations resulting
> from the obesity in the residual functional capacity assessment in
> addition to any limitations resulting from any other physical or
> mental impairment identified.

(R. 20) The ALJ goes on to state that he considered obesity at steps four and five and then reiterates that "I have fully considered obesity in the context of the overall record evidence in making this decision" without elaboration. (R. 20) True, the ALJ cites SSR 02-1p; more is required, however, to demonstrate that the ALJ satisfied the obligation to consider whether obesity, in conjunction with other impairments, equals a listing.

The ALJ's discussion of obesity at step three does not show sufficient analysis. The ALJ notes that he "evaluated the impairment herein pursuant to the extensive and detailed guidelines set forth in SSR 02-1p," but does not actually, medically or factually, address whether Mr. Dixon's obesity compounds his other impairments so that his impairments meet or equal a listed impairment. "[I]t is the ALJ's responsibility . . . to identify the relevant listed impairment(s) and develop the arguments both for and against granting benefits." *Torres v. Comm'r of Soc. Sec.*, 279 Fed.Appx. 149, 151–52 (3d Cir. 2008) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 n.2 (3d Cir. 2000)) (internal quotations omitted); *see also* SSR 02-1p.

The Commissioner then suggests that, in any case, the ALJ discussed Mr. Dixon's obesity later, at steps four and five in his RFC determination. There, says the Commissions, the ALJ "noted Plaintiff's obesity, his height, his weight, and his BMI (TR. 23, 25)." This, the Commissioner argues, is sufficient to satisfy the requirements of SSR 02-1p and *Diaz.* (*See* SSA Br. at 15.) *Diaz* mandates, however, that "an ALJ must meaningfully consider the effects of a claimant's obesity, individually and in combination with her impairments, on her workplace function *at step three* and at every subsequent step." *Diaz*, 577 F.3d at 504 (emphasis added). *Diaz* also mandates that the ALJ engage the evidence and "clearly set forth the reasons for his decision" so that an appellate

court can conduct "meaningful judicial review." *See id.* ("an ALJ must clearly set forth the reasons for his decision. Conclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient. The ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review.") (citing B*urnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000)). A blanket statement that an ALJ has considered evidence or one reference to a claimant's weight at another step is not the same thing as an ALJ's actually discussing the evidence and clearly setting forth the reasons for his decision as *Diaz* and *Burnett* require, at step three.

Finally, as discussed below, the ALJ's failure to consider Mr. Dixon's obesity at step three is additionally problematic in conjunction with his analysis of the severity of Mr. Dixon's other physical impairments.

### ii.    Listing 1.04

In step three, this Circuit's precedent "requires the ALJ to set forth the reasons for his decision." *Burnett*, 220 F.3d at 119 (citing *Cotter v. Harris*, 642 F.2d 700, 704–05 (3d Cir. 1981)).

Here, the ALJ found that "the severity of the claimant's physical impairments . . . did not meet or medically equal the criteria of any impairment listed in 1.04" (Disorders of the spine) because, says the ALJ, "the record does not demonstrate compromise of a nerve root (including the cauda equina); or the spinal cord with additional findings" that meet the impairments listed in 1.04A, 1.04B, or 1.04C of 20 C.F.R. pt. 404, subpt. P. app. 1 § 1.04. (R. 20)

Here, Dixon first contends that the ALJ did not consider Mr. Dixon's constellation of symptoms, including not just his spinal impairment but also his obesity, to determine whether his symptoms were medically equivalent to the impairments listed in 1.04. (Pl. Br. 22–23) To some degree, that contention echoes the one discussed above. Second, Dixon asserts that the ALJ erred at step 3 because the decision states in conclusory fashion that Dixon's

impairments do not meet the criteria in 1.04, but offers no reasoned analysis explaining why those impairments are insufficient. (*Id.* 24)

Paragraph A of 1.04 is most relevant here. To meet the severity requirements, a claimant must exhibit one or more listed spine disorders, such as herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, or degenerative disc disease, that result in a compromise of a nerve root (including the cauda equina) or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

The ALJ concedes that Mr. Dixon has had a history of back issues that are severe. Beginning in 2005, Mr. Dixon had surgery to repair discs in his back. In 2009, he had to have surgery again, this time having a spinal fusion. Nevertheless, the ALJ seemingly discredits Mr. Dixon's symptoms beginning in 2013 because "[a]fter his surgery in 2009, the claimant has never been hospitalized for any orthopedic related disorders." (R. 26) It does not strain imagination that being hit by a car and thrown to the ground could inflame a prior back condition. Indeed, there is no question that the medical record here establishes that Mr. Dixon suffers from a degenerative disc disease (R. 19) The only question is whether his spinal cord was compromised so as to meet the additional symptoms listed in 1.04A.

The record here contains substantial evidence that suggests that after being struck by the vehicle on July 13, 2013, Mr. Dixon suffered significant physical impairments until approximately October 2014, when his condition began to improve. From October 2014 until the date Mr. Dixon was last insured in September 2016, the record suggests that Mr. Dixon, while still suffering from back pain, began to improve more rapidly.

The ALJ fails to observe the distinction between those two periods. The opinion seems to discount the medical records from July 2013 to October

19

2014, noting that Mr. Dixon began to experience improvement in late 2014. This falls short of substantial evidence that Mr. Dixon was not impaired for the *entire* period July 13, 2013 to September 30, 2016.

The ALJ failed to give adequate consideration to the medical evidence from July 13, 2013 through October 2014. During this approximately fifteen-month period, Mr. Dixon was treated by Dr. Ryan, Nurse Practitioner De Lucia, and Dr. Nasser. To be sure, Dr. Nasser's notes from 2014 state that Mr. Dixon had a normal gait, normal range of motion, and normal muscle strength. (R. 332–56) However, Dr. Nasser, as the ALJ concedes, also diagnosed Mr. Dixon with lumbar radiculopathy (a pinched nerve) and unstable lumbar spine and advised that Mr. Dixon was disabled. (R. 24) It consistently remained Dr. Nasser's opinion that it was medically necessary for Mr. Dixon to have testing that was directly related to the July 2013 motor vehicle accident. Dr. Nasser sent Mr. Dixon for additional diagnostic testing, which included nerve conduction studies, CT scans, and needle electromyography. (R. 341) Mr. Dixon's insurance repeatedly denied these requests.

Moreover, it is also clear that Dr. Nasser's notes indicating that Mr. Dixon had a normal gait, range of motion, and muscle strength cannot be reconciled with the opinions of Dr. Ryan and NP De Lucia. It is unclear why the ALJ discounted Dr. Ryan's and NP De Lucia's assessments. (R. 23–24) The ALJ does not specifically address NP De Lucia's reports and findings; the ALJ only points to late 2014 entries where Mr. Dixon reported that he was beginning to improve. Notably, almost a year after the accident, NP De Lucia found in June 2014 that Mr. Dixon was unable to hold his body and head erect, he was unbalanced, had poor muscle/strength/tone, he had decreased flexion, rotation, and extension of his lumbar spine, unsteady gait, but was able to walk on his heels and toes. (R. 387–888) NP De Lucia continues to note these deficiencies into the fall of 2014. Nevertheless, the ALJ broadly concludes from this that Mr. Dixon had normal gait, his straight leg raising tests were negative, and that he had normal motor strength in his upper and lower extremities. It is only in the fall of 2014, when Mr. Dixon received a TENS unit and additional

therapy, that he began to feel better. (*See, e.g.*, R. 416–17 (De Lucia November 2014 notes); R. 418 (De Lucia December 2014 notes))

Likewise, Dr. Nasser's assessment of Mr. Dixon's gait and muscle strength cannot be squared with Dr. Ryan's. From January 2014 through April 2014, Mr. Dixon was seen by Dr. Ryan who found that Mr. Dixon suffered from pain, spasms, tender muscles in his back, swelling with tenderness in his spine, weakness, and decreased joint mobility. (*See, e.g.*, R. 358–59, 361–62)

Collectively, there is substantial evidence that contradicts the ALJ's finding that "every physical examination reflects full motor strength of both the upper and lower extremities bilaterally." (R. 26) The ALJ, to be sure, is entitled to sift the evidence and decide which accounts to credit. Here, however, the ALJ failed to address the conflicting evidence from July 2013 to October 2014 regarding Mr. Dixon's impairments and failed to explain why it should be disregarded at step three of the analysis. That flaw, even standing alone, would be grounds for remand so that the necessary balancing can be performed. *See Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) ("Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided."); *Burnett*, 220 F.3d at 119 (3d Cir. 2000) (stating "this Court requires the ALJ to set forth the reasons for his decision" and remanding because "the ALJ merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment, without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning") (citing *Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996); Logan v. Astrue, CIV.A. 07–1472, 2008 WL 4279820 (W.D. Pa. Sept.16, 2008) ("an ALJ may not capriciously disregard competent medical evidence, however, an ALJ is permitted to discredit medical evidence that conflicts with other evidence in the record, provided that the ALJ provides his or her reasons for doing so").

While the ALJ is best positioned to judge a claimant's impairments, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the Secretary's decision is not supported by substantial evidence." *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Here, the ALJ's disregard for Mr. Dixon's physical impairments and obesity from July 2013 to October 2014 call for a remand. Additionally, because I am not satisfied that Mr. Dixon's obesity was adequately considered at step three, I will further remand for additional findings as to how, if at all, Mr. Dixon's obesity impacts the ALJ's findings at step three as to the entire period from July 2013 to September 30, 2016.

## II. CONCLUSION

For the foregoing reasons, the case is **REMANDED** to the Commissioner for additional proceedings consistent with this opinion.

On remand, the ALJ shall fully develop the record and explain his findings at step three, including an analysis of whether Dixon's combined impairments, including obesity, are equivalent in severity to one of the listed impairments. The ALJ shall consider whether there was a disability in part of the claimed period, *i.e.*, July 2013 to October 2014. If necessary, the assessment at step four shall likewise consider all pertinent medical evidence and explain how any conflicts were reconciled. Finally, if it is necessary to reach step five, the ALJ is directed to make the requisite factual findings with regard to the level and transferability of Dixon's skills.

I express no view, however, as to what those findings should be. A separate order will issue.

Dated: February 20, 2020

Hon. Kevin McNulty
United States District Judge